ORIGINAL

# In the United States Court of Federal Claims

No. 12-253C

Filed: January 27, 2015

**FILED**

JAN 27 2015

U.S. COURT OF
FEDERAL CLAIMS

```
* * * * * * * * * * * * * * *    *
BRODY J. MCCLELLAN,                *
                                   *
                Plaintiff,         *
        v.                         *
                                   *
UNITED STATES,                     *
                                   *
                Defendant.         *
                                   *
* * * * * * * * * * * * * * *    *
```

Pro Se Plaintiff; Military Pay; Motion for Judgment on the Administrative Record.

**Brody J. McClellan**, Lansing, MI, pro se.

**Scott R. Damelin**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for the defendant. With him were **Scott D. Austin**, Assistant Director, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Joyce R. Branda,** Acting Assistant Attorney General, Civil Division, Washington, DC. Of counsel, **Major Christopher C. Cox**, United States Army Litigation Division, Fort Belvoir, VA.

## O P I N I O N

### HORN, J.

Plaintiff, Brody J. McClellan, filed a complaint, followed by an amended complaint, in the United States Court of Federal Claims, alleging that the Army Board for Correction of Military Records (ABCMR) erred in multiple ways. Among his claims, plaintiff alleges that he was denied due process when the military concluded that plaintiff had a duty to attend training sessions, that the government did not adhere to its own regulations when plaintiff was denied his transfer request, and when the defendant ignored an Article 138 complaint, as well as an alleged conflict of interest on the part of the Board of Inquiry. Plaintiff seeks back pay and benefits from his alleged wrongful discharge "from the date of discharge to the date of judgment," as well as "reinstatement into the Army Individual Ready Reserve," "promotion to the grade 0-2," "upgrade of characterization of discharge to fully Honorable," and the removal of "all derogatory records pertaining to" the events leading up to his "Other than Honorable" discharge.

## FINDINGS OF FACT

Plaintiff enlisted the United States Army Reserve on November 8, 2004, and was honorably discharged from active duty on August 31, 2005, to accept a commission in the United States Army Reserve.[1] Plaintiff was commissioned as a second lieutenant in the United States Army Reserve, effective September 1, 2005. Plaintiff joined the 301st Military Intelligence Battalion, 500th Military Intelligence Brigade, stationed in Phoenix, Arizona, although at the time plaintiff lived in Tucson, Arizona, which is more than 50 miles away from the unit. On September 25, 2006, plaintiff was subsequently assigned to the Military Intelligence Augmentation Detachment (MIAD).

Two months after his assignment to MIAD, on November 28, 2006 and November 29, 2006, plaintiff and his commanding officer, Captain Sandra Orlandella, exchanged multiple e-mails. Based on the record before the court, the first e-mail from plaintiff on November 28, 2006 informed Captain Orlandella that "[f]or the December BA [Battle Assembly] I will be in DC & then home to Michigan for Christmas, I request an excused absence for the month. I will do extra days after my classes are finished in May." Captain Orlandella responded the same day, explaining that "[w]e have mandatory briefings in DEC and would like to see everyone present. Your place of duty is here during BA unless properly excused. You should never make arrangements for travel until RST [Rescheduled Training] request forms are signed and approved by me." On November 28, 2006, plaintiff replied that Captain Orlandella's response was

> [k]ind of a curt message, I'm not sure why. When I was transferred to A company, I was not aware of this policy. I have no problem, never have, of recognizing my "place of duty during BA." I do not appreciate the implication that I do have a problem. If this was not your intent in your last message, please be precise with your writing when addressing another officer, subordinate or otherwise. Also keep in mind, until BA or Active duty periods, you are speaking to a civilian . . . . After coming upon a situation, it is imperative that as officers in the Reserves, we conceptualize a situation as best possible, and if necessary, obtain more information before making comments or decisions. As an example, in this situation to make a proper judgment, I would of [sic] found out: Attendance record of soldier in past. Information symmetry levels (time in reserves vs. active - has solider been made aware of policies - when transferring companies, are different policies in effect & enforced, etc [sic])."

On November 29, 2006, Captain Orlandella answered, "[b]e advised this email is out of line and disrespectful. You are denied excusal for DEC BA and will report to my office to discuss further action immediately after formation on 16 DEC 06." Plaintiff responded the same day, November 29, 2006, and stated:

---

[1] In his amended complaint, plaintiff claims he was "honorably released from Active Duty to the reserve component September 2, 2005."

I disagree.  views [sic] and your email are disrespectful. When outside of drill or active duty, I am not subject to UCMJ [Uniform Code of Military Justice]. I expect to be addressed with respect and understanding. I do not understand your perspective and why you even sent the last two emails. I do not understand your decision making process. I will appeal this higher and conduct futher [sic] research just as soon as I'm done writing reports on Pandemic Flu response policies by the National Security Council. I really appreciate the added stress your [sic] giving me, without cause in the final weeks of this semester. I'll make sure to repay in kind.

During the email exchange, plaintiff received Order Number 011942, dated November 29, 2006, instructing him to attend the annual training from December 15-17, 2006. On November 30, 2006, plaintiff again contacted Captain Orlandella, this time by letter and again requested to be excused from the December 2006 annual training, citing to Army Regulation 140-1, Chapter 3, ¶ 3-12(e)(1), but he did not explain why he specifically qualified to be excused.[2] In the November 30, 2006 letter, plaintiff stated that Captain Orlandella had "failed to provide me with the initial counseling & orientation to Company policy regarding your requirement for arranging RSTs," and that "[i]n the event above RST is denied, this letter is to serve as official request for reassignment within the USAR [United States Army Reserve] and/or the MIAD." Plaintiff also stated in his letter to Captain Orlandella that the physical location for the training did not meet standards of Army regulations, which states, "[t]he maximum distance ARNGUS [Army National Guard of the United States] and USAR soldiers may travel involuntarily between their residence and the inactive duty training (IDT) training site must be within – a. A 50-mile radius of the inactive duty training (IDT) site. It will not exceed 1 1/2 hours of travel time one-way by car under average traffic, weather, and road conditions." Army Reg. 135-91 ¶ 5-5 (2005) (emphasis in original).

Plaintiff did not attend the annual training scheduled for December 15-17, 2006. Following plaintiff's absences, Captain Orlandella sent him a "Failure to Report for Annual Training" notification on December 19, 2006, which stated:

1. Attendance records for this unit show that you were absent from the scheduled Battle Assembly under AT [Annual Training] **Order #011942**, dated 29 November 2006, for the following period(s): **15 DEC 2006, 16 DEC 2006, and 17 DEC 2006**.

---

[2] Army Regulation 140-1 ¶ 3-12(e)(1) (2005) states that rescheduled training "will not be granted for the following situations: (1) Convenience of the soldier. However, employment conflicts, overtime, schooling, loss of income, verified medical problems or personal emergencies, may in the judgment of the unit commander, justify RST authorization." Plaintiff later argued to the Board of Inquiry and the Army Board for Correction of Military Records, and now claims to this court, that he missed the December 15-17, 2006 annual training "in order to care for family with severe medical emergency."

2. Under AR [Army Regulation] 135-91, you are required to attend all scheduled Battle Assemblies and annual training periods.

3. Unless the absences indicated in paragraph 1 are excused, you will have accumulated 4 unexcused absences within a 1 year period. The 1 year period begins on the date you incur your first unexcused absence.

4. As you are aware, if you accumulate 9 unexcused absences within a 1-year period, you become an unsatisfactory participant and you will be processed for separation from the Selected Reserve either by reassignment or discharge.

(emphasis in the original).

That same day, December 19, 2006, Lieutenant Colonel Joseph Francis Nadolski, plaintiff's Battalion Commander, sent plaintiff a "Letter of Reprimand" regarding the e-mails Captain Orlandella had received from plaintiff between November 28 and November 30, 2006. The "Letter of Reprimand" explained that Lieutenant Colonel Nadolski found plaintiff's e-mails "very disrespectful," "disturbing," and "threatening." Accordingly, Lieutenant Colonel Nadolski informed plaintiff that he was transferring him to "the Individual Ready Reserve to be noted as an unfavorable action." Lieutenant Colonel Nadolski warned plaintiff that if Lieutenant Colonel Nadolski was "made aware of any information concerning this type of behavior between now and your transfer into the IRR [Individual Ready Reserve], I will take swift action, possibly resulting in your punishment . . . and/or your involuntary separation from the United States Army Reserves."

On December 20, 2006, plaintiff received Order Number 016475, which noted that due to his absence from the December 15-17, 2006 annual training, "he missed movement, therefore he is considered AWOL [Absent Without Leave]." The following day, December 21, 2006, Captain Orlandella signed a "Report to Suspend Favorable Personnel Action,"[3] see Army Reg. 600-8-2 (2004), as a result of the December 19, 2006 "Letter of Reprimand." On February 28, 2007, the Military Intelligence Readiness Command sent plaintiff Order Number 07-059-00001, reassigning plaintiff from his current assignment to the Control Group Reinforcement, which is part of the Individual Ready Reserve, see Army Reg. 140-10 ¶ 4-2(b)(2) (2005), due to misconduct. Later that same day, February 28, 2007, the Military Intelligence Readiness Command revoked plaintiff's reassignment with Order Number 07-059-00003. The ABCMR stated that Order Number 07-059-00001 was "apparently issued in error."[4]

---

[3] A "Report to Suspend Favorable Personnel Action" is also known as a "Flag." See Hale v. United States, 107 Fed. Cl. 339, 341 n.2, aff'd, 497 F. App'x 43 (Fed. Cir. 2012), reh'g en banc denied (Fed. Cir. 2013).

[4] There are several date discrepancies in the Administrative Record and the parties' pleadings regarding exactly when plaintiff was reassigned to the MIAD after the

On March 8, 2007, Lieutenant Colonel Nadolski sent Mr. McClellan a counseling statement informing plaintiff that he remained a member of the Military Intelligence Augmentation Detachment because his transfer to the Individual Ready Reserve had not been approved. Lieutenant Colonel Nadolski further informed plaintiff of annual training that would take place on April 21-22, 2007. That same day, March 8, 2007, plaintiff e-mailed Lieutenant Colonel Nadolski. Plaintiff's email stated, in part, "I regret the nature of the situation that has occured [sic] between myself and the command, but stand by my actions that occured [sic] subsequent to my initial mistake of sending an email in response to an email from CPT. Orlandella that I considered disrespectful to myself." Plaintiff also stated that he "received a letter at my HOME . . . accusing me of a serious crime that the command was fully aware was a false accusation . . . . I made several requests to various members of the command after initial possible misunderstands [sic] by email for a direct meeting, only to be ignored." (capitalization in original). Regarding the March 8, 2007 counseling statement, plaintiff indicated "while I am in citizen status, as I am now, you can mind your own business on how I choose to address anyone. If you don't like it, you can write your congressman and request the law be changed . . . . You have no authority to request any American citizen be subject to military custom, courtesy and law." Therefore, plaintiff informed Lieutenant Colonel Nadolski "I will not be signing anything or attending anything until after further consultation with legal representation . . . . Upon further consultation with legal representation, I will contact you directly. I request all further communication from the unit or affiliated personnel cease."

On April 16, 2007, Lieutenant Colonel Nadolski sent plaintiff another counseling statement, denying plaintiff's request to be excused from the April 21-22, 2007 annual training. Plaintiff subsequently failed to attend the April 21-22, 2007 annual training. On May 31, 2007, Lieutenant Colonel Nadolski sent plaintiff a third counseling statement in which he reiterated to plaintiff that plaintiff remained a part of the MIAD, and that Lieutenant Colonel Nadolski would not consider transferring plaintiff until he fulfilled his obligations, including attending battle assemblies. The May 31, 2007 counseling statement recognized plaintiff's assertion that he had moved from Tucson, Arizona to Michigan. Lieutenant Colonel Nadolski reminded plaintiff that plaintiff's travel expenses to and from battle assemblies were reimbursable. On June 6, 2007, plaintiff acknowledged receipt of the May 31, 2007 counseling statement by e-mail to Lieutenant Colonel Nadolski's personnel officer, Lieutenant Michael Padilla. Plaintiff explained to Lieutenant Padilla that "[t]he statements on the counselig [sic] statement inferring I am

---

February 28, 2007 orders, apparently issued in error, transferred him to the Individual Ready Reserve. Upon review of Administrative Record, it appears that after the February 28, 2007 orders transferring plaintiff to the Individual Ready Reserve, another order was issued, also dated February 28, 2007, revoking the transfer. Although the ABCMR found that "Orders were published in June 2007 reassigning him [plaintiff] to the MIAD." A copy of Orders 07-122-00008, dated May 2, 2007, included in the record indicates that plaintiff was assigned to the Military Intelligence Augmentation Detachment, but that the effective date of the orders was listed as September 25, 2006.

not meeting my obligations or 'duty'. . [sic] and reasons for being 'flagged' are counter-factual, full of circular logic and are generally deragatory [sic]." Plaintiff asserted that he was employed with the Michigan state legislature "with a set schedule," and, thus, could not meet his duties in Phoenix anymore, but suggested that he could "meet [his] requirements with a local unit or a closer commute MIAD unit or other reserve MI [Military Intelligence] unit, such as DC . . . ." Plaintiff also stated that he could "best serve the needs of the army in another unit."

On June 15, 2007, Lieutenant Colonel Nadolski recommended that a "board of officers" be convened to determine whether plaintiff should "remain a commissioned officer in the United States Army Reserve." Plaintiff's Officer Evaluation Report for the period August 3, 2006 to August 2, 2007 rated him with "unsatisfactory performance." The Officer Evaluation Report stated that plaintiff only "attended 3 of 12 Battle assemblies . . . failed to report to duty as ordered during the rest of the rating period. From December 2006 onward, 2LT [Second Lieutenant] McClellan was disrespectful on several emails to his chain of command and failed to comply with numerous direct orders."

On August 12, 2007, plaintiff was notified that an involuntary separation action was being initiated against him due to "acts of personal misconduct and conduct unbecoming [of] an officer." Plaintiff was told that he had "failed to obey fragmentary Annual Training orders," and that he had shown "severe disrespect for superior officers, as demonstrated in several e-mails sent by you." Plaintiff was advised of his rights, including: (1) his right to be furnished copies of the records which would be submitted to the Board of Inquiry;[5] (2) the right to be present at the Board of Inquiry at his own expense and have a reasonable time to prepare his case (at least thirty days between the notification and the Board of Inquiry hearing); (3) the right to be represented at any hearing by appointed counsel, military counsel of his own choice "if reasonably available," or by civilian counsel at his own expense; (4) the right to submit statements on his own behalf; and, (5) the right, if plaintiff is a minority officer, to request in writing that the Board include a minority officer. Additionally, plaintiff was advised that he had fifteen days to respond to the notice and that the Board of Inquiry would still act upon the case even if plaintiff failed to respond.

---

[5] See Army Reg. 600-8-24 ¶ 4-6 (2006) ("The Board of Inquiry's purpose is to give the officer a fair and impartial hearing determining if the officer will be retained in the Army. Through a formal administrative investigation conducted under AR 15-6 and this regulation, the Board of Inquiry establishes and records the facts of the Respondent's alleged misconduct, substandard performance of duty, or conduct incompatible with military service. Based upon the findings of fact established by its investigation and recorded in its report, the board then makes a recommendation for the officer's disposition, consistent with this regulation."). The Board of Inquiry in plaintiff's case also is referred to in the Administrative Record as the "separation board" and the "board of officers."

Plaintiff began e-mail communications with attorney Joseph Giblin, in the office of the Judge Advocate General (JAG) on August 13, 2007, regarding the pending separation action. JAG attorney Giblin recommended to plaintiff that he explore military and civilian counsel. The Army initially assigned a military attorney, Major D. Christopher Russell, to plaintiff to defend him in preparation for and during the upcoming Board of Inquiry separation hearing. Major Russell ceased representing plaintiff on September 8, 2007.[6] On October 20-21, 2007, the MIAD had another training session, which plaintiff also did not attend.

On October 25, 2007, plaintiff tried to contact JAG attorney Giblin, indicating that (1) the Army had not established jurisdiction "to apply regulation and UCMJ;" (2) that he had exhausted military remedies including Inspector General requests; and (3) that, if the Board of Inquiry were to recommend separation, his preferences would be to transfer to the Individual Ready Reserve or be honorably discharged. On October 29, 2007, plaintiff received a "Letter of Instruction" informing him that he was required to attend all scheduled unit training assemblies, and that unless the October 20-21, 2007 assemblies were excused, plaintiff would have accrued twenty unexcused absences within a one year period. Plaintiff was told that absences for training assemblies may only be excused for reasons of injury, sickness, emergency, or other circumstances beyond his control, and that plaintiff should furnish an affidavit or certification with any request for excusal, which may or may not be approved within ten days of receipt of request.

On November 14, 2007, plaintiff received formal notification in the form of a "Letter of Instruction," that his Board of Inquiry hearing would occur on December 17, 2007, to determine whether he should be discharged, and if so, to determine the characterization of his service. On December 8, 2007, plaintiff acknowledged receipt of the "Letter of Instruction," and responded with, among other statements, "[a]ttendance at formal training with unit is inappropriate until such time as any review and investigation is complete," that "[a]ll subsequent absences were also post-formal request to transfer and post receiving false documents falsely accusing me of a crime," and that the "Letter of Instruction" was inappropriate in general. From December 8-10,

---

[6] The December 17, 2007 transcript from the Board of Inquiry hearing stated that plaintiff's counsel was "discharged by Respondent [plaintiff]." Major Russell's e-mail, included with plaintiff's pleadings, however, indicates that Major Russell requested to withdraw due to plaintiff's desire to pursue injunctive relief in civilian court, "which is outside the scope of TDS [Trial Defense Service] representation." The Regional Defense Counsel for the 22nd Legal Support Organization – West Region approved Major Russell's withdrawal as counsel for plaintiff, and stated that "the officer [plaintiff] must retain civilian counsel at his own expense or proceed pro se." The Regional Defense Counsel also stated that "[t]he officer client [plaintiff] should be advised that the 22d LSO [Legal Support Organization] will not supply new defense counsel when the client decides not to follow the advise [sic] of his counsel or elects to pursue a course of action that is not authorized by the military defense's counsel's ethical obligations or military regulation."

2007, plaintiff sent materials to JAG attorney Giblin for consideration by the Board of Inquiry, for which JAG attorney Giblin confirmed receipt. JAG attorney Giblin also attempted to confirm, based on plaintiff's e-mails, that neither plaintiff, nor any representative on behalf of plaintiff intended to appear before the Board of Inquiry to present material.

On December 17, 2007, the Board of Inquiry held plaintiff's separation hearing, which plaintiff did not attend.[7] All written materials plaintiff forwarded for consideration were submitted as evidence to the Board of Inquiry on plaintiff's behalf by JAG attorney Giblin. After the separation hearing, the Board of Inquiry discharged plaintiff from the Army with a characterization of "Other than Honorable" due to:

> sufficient evidence to support the finding that 2LT Brody McClellan failed to obey fragmentary AT orders IAW [In Accordance With] Orders # 011942 dated 29 November 2006. Soldier failed to report for Fragmentary Annual Training commencing on 15 December 2006 for three days. In addition, by 29 October 2007 the Soldier had accumulated a total of 20 unexcused absences within a one year period as documented in a Letter of Instructions Unexcused Absences dated 29 October 2007 from the A/301st MI BN Commander. Clearly, 2LT McClellan has not performed his assigned duties as directed.

> Shows severe disrespect for superior officers as demonstrated in emails commencing on 28 November 2006 addressed to CPT Sandra Orlandella. Furthermore, in an email dated 8 March 2007 and a letter dated 8 December 2007, from 2LT McClellan to LTC Joe Nadolski, 2LT McClellan continued to show severe disrespect to superior officers. Examples of the disrespect include failure to recognize command authority and failure to display any remorse or desire to correct his behavior.

On January 10, 2008, plaintiff notified JAG attorney Giblin that plaintiff had not received any documentation from the Board of Inquiry's results, and that he would need such documents in order to proceed. On January 14, 2008, JAG attorney Giblin responded that the materials from the Board of Inquiry were being "compiled and prepared for forwarding to higher headquarters," and that the Board of Inquiry's recommendation "will not become final unless/until acted upon by Headquarters, Department of the Army." The Military Intelligence Readiness Command approved the Board of Inquiry's decision to discharge plaintiff on September 30, 2008, and requested final approval of the Board of Inquiry's findings by the United States Army Reserve

---

[7] One member of the JAG office, who reviewed the Board of Inquiry's proceedings, concluded that plaintiff's "request for a new attorney was denied by the Regional Defense Counsel. Respondent did not retain private counsel, nor did he appear at the Board. The right to counsel and the right to appear are important, but waivable, rights. Respondent's failure to appear at the board to object or provide any written objection for the denial of a second counsel effectively waive [sic] his right to representation."

Command. On October 1, 2008, Headquarters, Military Intelligence Reserve Command, published Order Number 08-275-00011 discharging plaintiff from the Army Reserve. On October 23, 2008, however, the Military Intelligence Reserve Command revoked the October 1, 2008 order, because, according to Army personnel, e-mail correspondence contained in plaintiff's Official Military Personnel File, the Military Intelligence Reserve Command did not have the authority to discharge plaintiff from service.

On March 6, 2009, the Commander of the United States Army Reserve forwarded plaintiff's Board of Inquiry separation results to the commander of the United States Army Human Resources Command requesting final action. On October 9, 2009, the United States Army Human Resources Command approved the Board of Inquiry's recommendation to discharge plaintiff. One week later, on October 16, 2009, the Army officially discharged plaintiff from service under "Other than Honorable" conditions, with an effective date of November 16, 2009

On September 17, 2010, plaintiff submitted an application to the ABCMR, requesting that "the board of officers [sic] decision be overturned and that I be reinstated as a Commissioned Reserve Officer. If the board does not wish to reinstate me I ask that my discharge be upgraded to Honorable." Plaintiff also alleged various claims regarding his alleged unlawful separation from the Army, such as "Board proceedings tainted due to Violation of Regulation & Federal Law." The ABCMR identified 19 contentions from plaintiff's eleven assertions of legal error. The ABCMR's characterized plaintiff's numerous and lengthy claims raised to the ABCMR as follows: [8]

    a. he was first notified of the board's decision at the end of 2008 despite a regulatory requirement to be informed immediately after the board's decision;

    b. he believes that denial of the report of proceedings and failure to inform him of the outcome violated multiple regulations as well as federal law;

    c. the board of officers did not discuss and refused to admit clear information that the orders they believed he disobeyed were clearly illegal and he had a right and duty to disobey unlawful orders;

    d. he had been legally transferred to the IRR and a command may not lawfully complete a transfer to the IRR and then arbitrarily revoke the transfer;

    e. he was never provided any valid activation or transfer orders out of the IRR nor was he provided subsequent activation orders for active duty training until the date on the activation orders had already passed;

    f. the assertion that he was disrespectful was invalid;

---

[8] Plaintiff does not raise claims (e), (k), (m), (p), and (s) in this court.

g. U.S. Reservists are not subject to the UCMJ when not in an active status, hence how could it be considered disrespectful or conduct unbecoming a commissioned officer to say this at anytime [sic] to anyone;

h. he formally submitted a request for transfer to a local Reserve unit within commuting distance pursuant to Army Regulation;

i. he resided well over 100 miles from Phoenix at the time and Army regulations command that Reservists will drill at local units;

j. he was flagged only because he requested to be transferred to another unit;

k. he abruptly received a letter warning him that he was considered AWOL and missing movement because he missed one inactive training battle assembly and this constituted a felony because it was on Army letterhead;

l. the board of officers refused to entertain evidence of violations of law and regulations;

m. he was never offered the opportunity to review the evidence submitted to the board of officers and to demonstrate why the evidence may have supported his arguments and defense;

n. his command refused to respond to his Article 138 complaint submission;

o. his command refused to provide him with adequate opportunity to appear at the board hearing, which was in violation of Army regulations and in violation of due process;

p. except for a few truly exceptional circumstances, the President of the United States and therefore his subordinate military representatives have no authority whatsoever to issue orders under military law to civilians;

q. Reservists who are off duty live in a very different cultural and legal context than active duty personnel;

r. permitting the arbitrary application to inactive personnel of regulations meant clearly for the active-duty military would create clear conflicts of interest, separation of powers issues, and is not compatible with the Citizen-Soldier concept; and

s. since his separation from military service, he has continued to actively serve his community by advancing his education, working, and volunteering his services.

The ABCMR denied plaintiff's application in full on August 16, 2011 because plaintiff had "provided insufficient evidence to substantiate the contentions he has made in his appeal." The ABCMR found, in part:

4. There is no evidence in the available record, nor has he [plaintiff] submitted any evidence, showing that his request to be excused from battle assembly was approved.

5. Although orders were published reassigning him to the USAR Control Group (Reinforcement) on 28 February 2007, he was notified in March 2007 that his request was denied and that he was still a member of the MIAD and expected to attend training. The records show he continued to show disrespect to members in his chain of command. His records were flagged and he should not have been reassigned. Orders were published in June 2007 reassigning him to the MIAD. His contention that he never received the orders is not supported by the evidence of record.

6. His transportation to and from training was reimbursed. He has failed to provide evidence showing that any of the actions taken against him was the result of his desire to be reassigned to another unit or that the board of officers failed to comply with applicable regulations. He was told that the flag would be lifted once he started fulfilling his service obligation and although he contends that he had every intention of doing so, it does not appear that he did.

7. Additionally, unexcused absences are considered to be AWOL incidents. He has not shown error or injustice in the action taken by the board of officers that recommended he be discharged under other than honorable conditions. The fact that he disagrees is not a basis for reinstating him in the USAR or upgrading his discharge.

8. There is no evidence of any violation of the applicant's rights. He was an officer in the USAR and was subject to laws and regulations pertaining to USAR officers. He had an obligation to conduct himself as a USAR officer.

(capitalization and emphasis in original).

Plaintiff filed suit in this court, claiming that the ABCMR erroneously denied his application because:

(1) Defendant "failed to obey regulations and the statutes governing the involuntary activation of IRR [Individual Ready Reserve] members," on the grounds that the

government "failed to demonstrate [that] the plaintiff had a duty to attend battle assembly periods that were scheduled subsequent to the plaintiff being discharged out of the US Army Ready Reserve into the individual ready reserve (IRR);"

(2) Defendant "had no lawful authority to affect an involuntary activation of the plaintiff by 'revoking' the orders placing plaintiff into the IRR;"

(3) Defendant "failed to adhere to Army Regulation 140-10, 1-10, par. (1) which states that reserve assignments 'MUST BE' within 50 miles of an Officers [sic] residence," and the defendant "failed to redress injustice" regarding Army Regulation 140-10 by denying his transfer request because "the administrative record demonstrates that Lieutenant-Colonel Nadolski acknowledged under oath this demand to transfer to a local unit was submitted in writing prior to any 'flagging' action, even though the 'flagging' action for 'misconduct' was used by him [Lieutenant Colonel Nadolski] as a premise to deny the transfer request;"

(4) Defendant "failed to comply with Army regulations commanding that personnel should be afforded an opportunity to transfer to another unit in order to 'rehabilitate' where a problem exists;"

(5) The "Board of Inquiry legal officer permitted the submission of a telephone wiretap/recording to the board of separation through the commission of a felony under state laws barring the recording and transmission to third parties of telephone conversations without authorization of all parties; the recording was never provided to the plaintiff prior to the Board of Inquiry hearing in contravention of regulations governing the separation of officers . . . ;"

(6) Defendant "refused to produce any documentation whatsoever elucidating either the conduct of, or the outcome of the Board of Inquiry for case 07-0050 [plaintiff's case] for approximately one year after the hearing in contravention of regulations governing the separation of Officers which command that the board decision and documentation from the hearing should be made available to the respondent immediately," and that the ABCMR "failed to consider the substantial harm caused to plaintiffs [sic] ability to seek redress due to this delay [in furnishing Board of Inquiry decision documents,] including hindering the ability to challenge procedures, submit appeals prior to the finalization of separation, or to locate or identify and question witnesses under oath;"

(7) Defendant "refused to process plaintiff's [UCMJ] Article 138 complaint which was submitted prior to the board hearing;"

(8) Plaintiff was "denied due process of law by ineffective assistance of counsel;"

(9) Plaintiff was "denied due process of law by the refusal of the Defendant to provide for expenses for transport to the board of separation hearing;"

(10) The "board of inquiry president had a substantial conflict of interest and should have recused herself but did not;"

(11) The Board of Inquiry "failed to obey regulations pertaining to the separation of officers due to board composition as plaintiff is a member of a federally recognized Native American tribe;" and

(12) The ABCMR "failed to consider complex questions and precedent" regarding various alleged military customs and "jurisdictional questions" that plaintiff claims support his argument of a pretextual discharge regarding the ABCMR's "disrespect" findings.

(footnote omitted; capitalization in original).

In this court, plaintiff seeks the following forms of relief:

(a) For all pay and allowances together with all benefits plaintiff may have been deprived of as a result of his discharge, from the date of discharge to the date of judgment, including but not limited to reimbursement for medical insurance necessitated by cessation of coverage of him and his family; COLA allowance; accumulated leave pay; and PX and commissary privileges;

(b) Promotion to the grade 0-2 and reinstatement into the Army Individual Ready Reserve;

(c) For the removal of all derogatory records pertaining to improprieties as the court may find to be just and proper;

(d) For upgrade of characterization of discharge to fully Honorable;

(e) For such other and further relief as the court may find to be just and proper.

After plaintiff filed his amended complaint, defendant moved for Judgment on the Administrative Record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC). Defendant argues that the ABCMR properly upheld plaintiff's discharge after reviewing and assessing plaintiff's record and applying the appropriate Army regulations. Furthermore, defendant contends that plaintiff inappropriately raised four new claims in this court which were not presented to the ABCMR, namely: (1) failure to comply with regulations permitting transfer "To Rehabilitate Where A Problem Exists;" (2) violation of due process by ineffective counsel; (3) conflict of interest within the Board of Inquiry; and (4) failure of the Board of Inquiry to provide plaintiff with ethnic minority representative. Defendant argues that plaintiff waived these claims when he did not raise them before the ABCMR.

Plaintiff filed a Response and a Cross-Motion for Judgment on the Administrative Record, arguing that the defendant's own "Statement of the Facts" supports the first four claims in plaintiff's complaint. Plaintiff's also argues that the defendant's remaining arguments "Lack Sound Reasoning and Are Not Supported By the Administrative Record." Plaintiff, therefore, requests judgment upon the Administrative Record, or in the alternative for remand of his case to the ABCMR. Furthermore, plaintiff requests that if this court "finds a claim has not been stated for which relief can be granted by the Court, or if this honorable Court finds no subject-matter jurisdiction plaintiff respectfully requests the case be transferred to the Federal District Court for the District of Columbia."

## DISCUSSION

Pleadings filed by pro se plaintiffs are entitled to liberal construction and judged by "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520-21, reh'g denied, 405 U.S. 948 (1972); see also Erickson v. Pardus, 551 U.S. 89, 94 (2007); Hughes v. Rowe, 449 U.S. 5, 9-10 (1980); Estelle v. Gamble, 429 U.S. 97, 106 (1976), reh'g denied, 429 U.S. 1066 (1977); Matthews v. United States, 750 F.3d 1320, 1322 (Fed. Cir. 2014); Diamond v. United States, 115 Fed. Cl. 516, 524 (2014). "The purpose of this relaxed standard is to ensure that the pro se plaintiff's case is evaluated on the merits and is not dismissed on the basis of technicalities." Ebert v. United States, 66 Fed. Cl. 287, 289 (2005) (citing Foman v. Davis, 371 U.S. 178, 181 (1962)). "[I]t has long been the role of this court to examine the record 'to see if [a pro se] plaintiff has a cause of action somewhere displayed.'" Ayres v. United States, 66 Fed. Cl. 551, 558 (alteration in Ayres v. United States) (quoting Ruderer v. United States, 188 Ct. Cl. 456, 468, 412 F.2d 1285 (1969), cert. denied, 398 U.S. 914 (1970)), recons. denied in part, 67 Fed. Cl. 776 (2005). "However, "'[t]here is no duty on the part of the trial court to create a claim which [the plaintiff] has not spelled out in his pleading.'"" Lengen v. United States, 100 Fed. Cl. 317, 328 (2011) (alterations in Lengen v. United States) (quoting Scogin v. United States, 33 Fed. Cl. 285, 293 (1995) (quoting Clark v. Nat'l Travelers Life Ins. Co., 518 F.2d 1167, 1169 (6th Cir. 1975))); see also Bussie v. United States, 96 Fed. Cl. 89, 94, aff'd, 443 F. App'x 542 (Fed. Cir. 2011); Shelkofsky v. United States, No. 13-1016C, 2014 WL 5648973, at *4 (Fed. Cl. Nov. 4, 2014) ("[W]hile the court may excuse ambiguities in a pro se plaintiff's complaint, the court 'does not excuse [a complaint's] failures.'" (quoting Henke v. United States, 60 F.3d 795, 799 (Fed. Cir. 1995))); Goodman v. United States, 100 Fed. Cl. 289, 301 (2011).

Pursuant to RCFC 52.1(c), which governs motions for judgment on the administrative record, the court's inquiry is directed to "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." Mgmt. and Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005)); see also Vellanti v. United States, No. 13-218C, 2015 WL 129027, at *7 (Fed. Cl. Jan. 9, 2015) (quoting Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 751 (2012)) ("RCFC 52.1 governs motions for judgment on the administrative record. . . . Unlike summary judgment, for

instance, 'a genuine dispute of material fact does not preclude a judgment on the administrative record.'").

Plaintiff asserts jurisdiction of this court based on 28 U.S.C. § 1491(a)(1), 37 U.S.C. § 206(a)(2), and the Fifth Amendment to the United States Constitution. While the court addresses each of plaintiff's twelve claims below, it first addresses the claims defendant agrees are properly before this court, opinion in the order which plaintiff presents them in his amended complaint, claims 1, 2, 3, 5, 6, 7, 9, and 12. The court then addresses plaintiff's claims not raised before the ABCMR, claims 4, 8, 10, and 11. For counts 1, 2, 3, 5, 6, 7, 9, and 12, the court reviews the 2011 ABCMR's decision "to determine whether it is arbitrary, capricious, unsupported by substantial evidence, or contrary to law." Lewis v. United States, 458 F.3d 1372, 1376 (Fed. Cir.) (citing Martinez v. United States, 333 F.3d 1295, 1305, 1314 (Fed. Cir. 2003), cert. denied, 540 U.S. 1177 (2004)), reh'g en banc denied (Fed. Cir. 2006), cert. denied, 552 U.S. 810 (2007); see also Chappell v. Wallace, 462 U.S. 296, 303 (1983) ("Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious, or not based on substantial evidence."); Burnick v. United States, 541 F.3d 1372, 1377 (Fed. Cir. 2010); Barnes v. United States, 473 F.3d 1356, 1361 (Fed. Cir.) ("We apply the same standard of review as the United States Court of Federal Claims, which means 'we will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005)), cert. denied, 552 U.S. 813 (2007); Metz v. United States, 466 F.3d 991, 998 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006); Porter v. United States, 163 F.3d 1304, 1312 (Fed. Cir. 1998), reh'g denied, en banc suggestion declined (Fed. Cir.), cert. denied, 528 U.S. 809 (1999); Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983); Skinner v. United States, 219 Ct. Cl. 322, 331, 594 F.2d 824, 830 (1979); Spellissy v. United States, 103 Fed. Cl. 274, 283 (2012) ("[W]hen a service member chooses to seek relief from a military corrections board, the court 'will not disturb the decision of [a] corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting Chambers v. United States, 417 F.3d at 1227) (second modification in original)). In Riser v. United States, the United States Court of Federal Claims noted that plaintiff must show that the decision by the ABCMR was arbitrary and capricious, contrary to law, or unsupported by substantial evidence, and that, in accordance with this deferential standard of review, the court does not reweigh the evidence, "but rather considers whether *the conclusion being reviewed* is supported by substantial evidence. So long as the Board considered the relevant evidence and came to a reasonable conclusion, this court will not disturb the Board's decision." Riser v. United States, 97 Fed. Cl. 679, 683–84 (2011) (quoting Heisig v. United States, 719 F.2d at 1157) (emphasis in original; other citations omitted); see also Holmes v. United States, 98 Fed. Cl. 767, 780–81 (2011) ("'The Board's decision will comply with the substantial evidence standard so long as a 'reasonable mind might accept' [the] particular evidentiary record as "adequate to support [the contested] conclusion."'" (quoting Dickinson v. Zurko, 527 U.S. 150, 162 (1999) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)))) (modifications in original)).

This standard of review is narrow. The court does not sit as "a super correction board." Skinner v. United States, 219 Ct. Cl. at 331, 594 F.2d at 830; see also Voge v. United States, 844 F.2d 776, 782 (Fed. Cir.) (The "court does not function as 'a sort of super Correction Board.'" (quoting Reale v. United States, 208 Ct. Cl. 1010, 1013, 529 F.2d 533, cert. denied, 429 U.S. 854 (1976))), cert. denied, 488 U.S. 941 (1988). Moreover, "military administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs." Dodson v. United States, 988 F.2d 1199, 1204 (Fed. Cir.), reh'g denied (Fed. Cir. 1993). "'[J]udges are not given the task of running the Army.'" Antonellis v. United States, 723 F.3d 1328, 1332 (Fed. Cir. 2013) (quoting Orloff v. Willoughby, 345 U.S. 83, 93 (1953)). The United States Supreme Court, however, has also stated:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) [reh'g denied and reh'g denied sub nom. SEC v. Fed. Water & Gas Corp. (1947)]. We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc., 419 U.S. [281,] 286, 95 S. Ct. 438, 42 L. Ed. 2d 447 [(1974)]. See also Camp v. Pitts, 411 U.S. 138, 142–143, 93 S. Ct. 1241, 36 L. Ed. 2d 106 (1973) (per curiam).

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43–44 (1983) (other citations omitted); see also SKF USA Inc. v. United States, 630 F.3d 1365, 1373 n.3 (Fed. Cir. 2011)). In sum, as a Judge of the United States Court of Federal Claims explained in Verbeck v. United States:

> The court's review in these matters is thus limited in scope and deferential in nature. Ms. Verbeck must show that the Board's decision was arbitrary and capricious, contrary to law, or unsupported by substantial evidence. See Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005) [cert. denied, 546 U.S. 1066 (2005)]; Godwin v. United States, 338 F.3d 1374, 1378 (Fed. Cir. 2003); Heisig [v. United States], 719 F.2d [1153, 1156 (Fed. Cir. 1983)]. . . . The Board's decision will comply with the substantial evidence standard so long as a "'reasonable mind might accept' [the] particular evidentiary record as 'adequate to support [the contested] conclusion.'" Dickinson v. Zurko, 527 U.S. 150, 162, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999) (quoting Consolidated Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). Similarly, the arbitrary and capricious standard "requires a reviewing court

to sustain an action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir.[), reh'g denied (Fed. Cir. 2000)].

In sum, the court must satisfy itself that the Board considered all of the relevant evidence and provided a reasoned opinion that reflects a contemplation of the facts and circumstances pertinent to the case before it. See Heisig, 719 F.2d at 1157 ("Under the substantial evidence rule, *all* of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion."); Van Cleave v. United States, 70 Fed. Cl. 674, 678–79 (2006) (While the court does not "serve as a 'super correction board[,]' Skinner v. United States, [219 Ct. Cl. at 331] . . . correction boards must examine relevant data and articulate satisfactory explanations for their decisions.") (citations omitted). If the Board "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the [Board], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]" its decision runs afoul of even this lenient standard of review. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).

Verbeck v. United States, 97 Fed. Cl. 443, 451 (2011) (second omission in original); see also PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010) (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058).

Plaintiff alleges that the ABCMR "failed to redress clear injustice" in that the government "failed to obey regulations and the statutes governing the involuntary activation of IRR members" because the government "failed to demonstrate the plaintiff had a duty to attend battle assembly periods . . . subsequent to the plaintiff being discharged out of the US Army Ready Reserve into the IRR." The ABCMR concluded that plaintiff had a duty to attend battle assembly periods after being transferred to the Individual Ready Reserve. The ABCMR found plaintiff

received a Failure to Report for Annual Training notification from his commanding officer dated 19 December 2006. The notification states he failed to attend battle assembly on 15, 16, and 17 December 2006, in accordance with Annual Training Order Number 011942, dated 29 November 2006. He was told that under the provisions of Army Regulation 135-91, he was required to attend all scheduled battle assemblies and annual training periods. He was also told that unless the absences were excused, he would have accumulated 4 unexcused absences with a 1 year period and if he accumulated 9 unexcused absences within 1 year, he would become an unsatisfactory participant and be processed for separation from the Selected Reserve either by reassignment or discharge.

The record supports the ABCMR's conclusions about plaintiff's duty to attend battle assembly periods after plaintiff was transferred to the Individual Ready Reserve.[9] The ABCMR cited to the May 31, 2007 counseling statement Lieutenant Colonel Nadolski sent to plaintiff. Lieutenant Colonel Nadolski made clear that plaintiff remained a part of the Military Intelligence Augmentation Detachment, and that Lieutenant Colonel Nadolski would not consider transferring plaintiff until he fulfilled his obligations, including attending battle assemblies. The May 31, 2007 counseling statement recognized plaintiff's representation that he had moved from Tucson, Arizona to Michigan. The ABCMR, however, noted plaintiff "was told that under the provisions of Army Regulation 135-91, he was required to attend all scheduled battle assemblies and annual training periods." Army Regulation 135-91 provides that "[s]oldiers will be charged with unsatisfactory participation when without proper authority they – (1) Accrue in any one-year period a total of nine or more unexcused absences from scheduled inactive duty training (IDT)s." Army Reg. 135-91 ¶ 4-12 (2005). The ABCMR correctly applied Army Regulation 135-91when it considered plaintiff's receipt of a "Letter of Instruction" on October 29, 2007, directing plaintiff to attend all scheduled unit training assemblies, and informing plaintiff that he would accrue 20 unexcused absences within a one year period if he did not submit a proper excuse for his four October 20-21, 2007 training assembly absences. Even assuming plaintiff had been properly reassigned to the Individual Ready Reserve on February 28, 2007, he still would have had a duty to attend training subsequent to February 28, 2007 under Army Regulation 135-91. See Army Reg. 135-91 ¶ 4-6(b) (2005) ("An IRR soldier will be determined to be an unsatisfactory participant subject to the enforcement provisions of chapter 6, under the following conditions: (1) When ordered to AT if, without proper authority, the soldier fails to attend or complete the entire period of AT."). Plaintiff failed to attend training multiple times, and accumulated over nine unexcused absences during a one-year period.

Furthermore, the ABCMR found, in part:

4. There is no evidence in the available record, nor has he [plaintiff] submitted any evidence, showing that his request to be excused from battle assembly was approved.

5. Although orders were published reassigning him to the USAR Control Group (Reinforcement) on 28 February 2007, he was notified in March 2007 that his request was denied and that he was still a member of the MIAD and expected to attend training. The records show he continued to

---

[9] As noted above on February 28, 2007, the Military Intelligence Readiness Command sent plaintiff Order Number 07-059-00001 reassigning plaintiff from his current assignment to the Control Group Reinforcement, part of the Individual Ready Reserve, due to misconduct. Later that same day, February 28, 2007 the Military Intelligence Readiness Command revoked plaintiff's reassignment with Order Number 07-059-00003, because as the ABCMR indicated, Order Number 07-059-00001 was "apparently issued in error."

show disrespect to members in his chain of command. His records were flagged and he should not have been reassigned. Orders were published in June 2007 reassigning him to the MIAD. His contention that he never received the orders is not supported by the evidence of record.

Plaintiff also claims that the Army "had no lawful authority to effect an involuntary activation of the plaintiff by 'revoking' the orders placing plaintiff into the IRR." In addition, plaintiff alleges that the ABCMR

> did not assert the argument that regulations allowed the "revocation" of orders transferring plaintiff into the IRR they only stated the orders appeared to be "issued in error" yet overwhelming evidence in the Administrative Record indicates the orders were intentionally issued and fully executed hence the plaintiff was in the IRR; no authority existed to involuntarily activate an IRR member by way of "revoking" the initial orders of the plaintiff.

Plaintiff is correct that the ABCMR commented that the February 28, 2007 orders assigning plaintiff to the Individual Ready Reserve were "apparently issued in error," and that "[a]lthough orders were published reassigning" Mr. McClellan to the IRR were issued on 28 February 28, 2007, he was notified in March 2007 that his transfer request was denied and that he was still a member of the Military Intelligence Augmentation Detachment and expected to attend training. The ABCMR noted that "his records were flagged and he should not have been reassigned." The orders transferring plaintiff into the Individual Ready Reserve were not valid because of plaintiff's flag or suspension of favorable personnel actions. The transfer orders were revoked for that reason. The ABCMR's statement that plaintiff's "records were flagged and he should not have been reassigned" was based on Army Regulation 600-8-2, which provides that

> [s]uspension of favorable personnel actions is mandatory when an investigation (formal or informal) is initiated on a soldier by military or civilian authorities. Flags are classified into the two categories described below, depending upon the specific action or investigation a. Non-transferable. The flag may not be transferred to another unit (except where consistent with paragraph 1–15).

Army Reg. 600-8-2 ¶ 1-11(a) (2004).

As previously explained by a Judge of the Court of Federal Claims, "[i]n military records, a flag is 'initiated immediately when a soldier's status changes from favorable to unfavorable,' Army Reg. 600–8–2 ¶ 1–10a, and results in a '[s]uspension of favorable personnel actions,' id. ¶ 1–11, for the soldier subject to the flag." Hale v. United States, 107 Fed. Cl. at 341 n.2; see also Boone v. United States, 53 Fed. Cl. 731 ("According to Army Regulation ('AR') 600–8–2, the Army will issue a flag 'when an unfavorable action or investigation (formal or informal) is started against a soldier by military or civilian authorities.' AR 600–8–2 § 1–11 (Nov. 30, 1987) . . . . The purpose of the flagging

system is 'to guard against the accidental execution of specified favorable personnel actions for soldiers not in good standing.' § 1–8."), vacated, 78 F. App'x 108 (Fed. Cir. 2003).

Plaintiff received a flag because he was absent without leave. In the May 31, 2007 counseling statement, Lieutenant Colonel Nadolski explained the flag process to plaintiff, and how to remove the flag. Lieutenant Colonel Nadolski informed plaintiff that "[y]our flag can be lifted after you begin to perform to standard." Plaintiff did not claim to the ABCMR, and does not claim to this court, that any Army Regulation 600-8-2 ¶ 1-15 exceptions apply to his case.[10] Although the ABCMR did not cite Army Regulation 600-8-2, the Board of Inquiry's finding that plaintiff had a duty to attend battle assemblies after the February 28, 2007 Individual Ready Reserve transfer orders due to plaintiff's non-transferable, pre-existing flag voiding those orders, is supported by Army Regulation 600-8-2 and substantial evidence. The ABCMR also examined the relevant evidence as to plaintiff's training responsibilities and failed attendance, and correctly applied Army Regulation 135-91 and Army Regulation 600-8-2 to determine plaintiff had a duty to attend the battle assemblies. The ABCMR's decision was not arbitrary or capricious, unsupported by substantial evidence, or contrary to law, and is supported by the Administrative Record.

Moreover, according to Army Regulation 140-10, "MUSARC [Major United States Army Reserve Command] commanders may reassign or attach soldiers under their command to . . . [t]he appropriate IRR control group." Army Reg. 140-10 ¶ 1-5(c) (2005). The Military Intelligence Readiness Command commander is a Major United States Army Reserve Command. The commander had the authority to transfer plaintiff to the Individual Ready Reserve. Under Army Regulation 600-8-105 ¶ 2-21, "[o]nly the organization that published the original order may amend, rescind, or revoke the order."

---

[10] Army Regulation 600-8-2 ¶ 1-15(c)(5) states that, "Flagged soldiers may be reassigned if -- (a) The flag is based on APFT [Army Physical Fitness Test] failure. (b) The flag is based on entry in the weight control program. (c) The flag case is in the punishment phase with no restraints on liberty imposed by civil court, court-martial, or Article 15. (d) Reassignment is deemed necessary by installation or major overseas commanders (within their command) for the maintenance of discipline, morale, and unit order." Army Reg. 600-8-2 ¶ 1-15(c)(5) (2004); see also Army Reg. 600-8-2 ¶ 2-5 (2004) ("Normally, soldiers with 'open' flag cases are not reassigned"); Army Reg. 600-8-2 ¶ 2-6 (contains Table 2-3, which provides steps required for transferring a flag). Upon review of the Administrative Record none of the steps identified in Army Reg. 600-8-2 ¶ 2-6 were followed in plaintiff's case, which may explain why Paragraphs 2-5 and 2-6 of Army Reg. 600-8-2 (2004) are not included in the Administrative Record. For purposes of this opinion, the court cites to the Army Regulation in effect at the time of the events in question. The court notes, however, a 2012 version of the Army Regulation provides that Soldiers with a nontransferable flag cannot be reassigned into the individual ready reserve. See Army Reg. 600-8-2 ¶ 3-1(b)(2) (2012) ("Soldiers with a nontransferable Flag may not be reassigned into the individual ready reserve or inactive National Guard.").

Therefore, the Military Intelligence Readiness Command, which issued the order, had authority to revoke the order. See Army Reg. 600-8-105 ¶ 2-21 (1994). Consequently, the ABCMR's findings regarding the revoked February 28, 2007 orders assigning plaintiff to the Individual Ready Reserve were not arbitrary or capricious, unsupported by substantial evidence, or contrary to applicable law.[11]

Plaintiff also asserts that the ABCMR erred in upholding his discharge on the grounds that the Board of Inquiry did not follow the reasonable commuting distance provisions of Army Regulation 140-10 or properly consider "conflicted" testimony or dates in the Administrative Record regarding plaintiff's request to transfer to a local unit. Plaintiff alleges that:

> AR 140-10, 1-10, par. (1) which states that reserve assignments "MUST BE" within 50 miles of an Officers [sic] residence; the Board for Correction failed to redress injustice by ignoring the administrative record in this regard; plaintiff clearly requested transfer to a local unit by electronic mail communication and by written correspondence significantly in advance of missing any battle assembly period; . . . the administrative record demonstrates that Lieutenant-Colonel Nadolski acknowledged under oath this demand to transfer to a local unit was submitted in writing prior to any "flagging" action, even though the "flagging" action for "misconduct" was used by him as a premise to deny the transfer request; sworn testimony by LTC Nadolski submitted to the board of inquiry regarding the request to transfer conflicted with sworn testimony of Captain Orlandella in this regard and may be evidence of perjury by Captain Orlandella.

(footnote omitted; capitalization in original).

Plaintiff alleges that, with respect to his transfer request, the ABCMR refused to:

> consider the date sequences of submitted evidence as relevant (AR 15) and the findings of the board should be set-aside because the defendant's own statements in conjunction with the administrative record is positive demonstrative that regulation was summarily violated and that the ABCMR clearly ignored this disregard for law and regulation by the board of officers.

---

[11] Although not raised by plaintiff before the ABCMR, plaintiff now alleges the order for transfer to the IRR was "fully executed" prior to revocation. According to the Administrative Record, the Military Intelligence Readiness Command, the same orders issuing authority that published the orders transferring plaintiff to the IRR, subsequently revoked those orders the same day. As defendant correctly notes, "[b]oth orders were issued by the same authority, addressed to the same individuals, on the same date, and issued within two transactions of each other." Therefore, plaintiff's contention that the order was "fully executed" is not supported by the record.

Plaintiff argues that the ABCMR "did not challenge the premise that a transfer request was made, nor did the immediate Reserve commander of Plaintiff deny receiving a request to transfer." (internal citations omitted). The ABCMR examined plaintiff's November 30, 2006 e-mail to Captain Orlandella and found that, "[o]n 30 November 2006, the applicant [plaintiff] submitted a request to be excused from battle assembly on 15, 16, and 17 December 2006, which he [plaintiff] contends was also a formal request for reassignment. On 21 December 2006, he was flagged as a result of receiving the LOR [Letter of Reprimand]." Plaintiff's immediate Reserve Commander, Captain Orlandella, indicated that "[w]hat I received was not a request. 2LT McClellan informed me that he would not be present." The November 28, 2006 and November 29, 2006 emails between plaintiff and Captain Orlandella are consistent with Captain Orlandella's statement. Plaintiff's initial November 28, 2006 email stated, "[f]or the December BA [Battle Assembly] I will be in DC & then home to Michigan for Christmas, I request an excused absence for the month. I will do extra days after my classes are finished in May." Captain Orlandella responded the same day, explaining that "[w]e have mandatory briefings in DEC and would like to see everyone present. Your place of duty is here during BA unless properly excused. You should never make arrangements for travel until RST [Rescheduled Training] request forms are signed and approved by me."

In the November 30, 2006 letter to Captain Orlandella, plaintiff also stated "[i]n the event above RST is denied, this letter is to serve as official request for reassignment within the USAR and/or the MIAD." The ABCMR found that plaintiff's

> transportation to and from training was reimbursed. He has failed to provide evidence showing that any of the actions taken against him was the result of his desire to be reassigned to another unit or that the board of officers failed to comply with applicable regulations. He was told that the flag would be lifted once he started fulfilling his service obligation and although he contends that he had every intention of doing so, it does not appear that he did.

The ABCMR's analysis is supported by substantial evidence in the Administrative Record and by Army Regulation 140-10. Army Regulation 140-10 ¶ 1-10(a) (2005) provides that a "reasonable commuting distance is defined as the longest distance a USAR soldier can be expected to travel involuntarily between his or her residence and a site where inactive duty training (IDT) will be conducted. (1) For officers . . . and enlisted soldiers, it is a distance within a 50–mile radius of the IDT site. It will not exceed 1 1/2 hours of travel time one–way by car under average traffic, weather, and road conditions." Defendant argues that Army Regulation 140-10 ¶ 1-8 demonstrates that the ABCMR did not err by failing to conclude that the Army violated Army Regulation 140-10, Under Army Regulation 140-10 ¶ 1-8(a) and ¶ 2-6, a solider may request transfer or attachment to another Army Reserve unit in four different ways.[12] Plaintiff has not

---

[12] See Army Reg. 140-10 ¶ 2-6(a) (2005) ("A soldier may request assignment to a USAR unit by doing one of the following: (1) Applying personally to the unit of choice.

shown that he used any of the four ways. Although plaintiff alleges that he "clearly requested transfer to a local unit by electronic mail communication and by written correspondence," there is no evidence that plaintiff signed the proper transfer request form, which the regulation requires. See Army Reg. 140-10 ¶ 1-8(a) (2005). As defendant correctly notes, "[n]one of the available options include written letter or email correspondence." Plaintiff's request was not in the proper format, nor does plaintiff contend he signed the required transfer request form. See Army Reg. 140-10 ¶ 1-8(a). Furthermore, at no point does plaintiff allege that a commander, Captain Orlandella or otherwise, approved his request for transfer.

Even if plaintiff had properly requested a transfer, the ABCMR found that at the time plaintiff alleges he requested a transfer, his "records were flagged and he should not have been reassigned." Plaintiff's allegations that the ABCMR failed to properly consider conflicting testimony regarding plaintiff's "demand to transfer to a local unit" and the date sequences of flagging also are unsupported in the record. With respect to the date sequences of flagging, the ABCMR considered: (1) plaintiff's November 30, 2006 e-mail requesting to be excused from battle assemblies; (2) plaintiff's December 21, 2006 flag; (3) Lieutenant Colonel Nadolski's May 31, 2007 counseling statement reminding plaintiff that the fact that plaintiff had moved from Tucson, Arizona to Michigan was irrelevant because he was still assigned to the MIAD unit and his traveling expenses were reimbursable; and (4) plaintiff's June 6, 2007 e-mail to Lieutenant Padilla asking for a transfer to a closer-commute unit due to plaintiff's move to Michigan. The Administrative Record demonstrates that plaintiff's request to transfer to a local Michigan unit, whether or not proper, was not received until after his flag was imposed. At the time his flag was imposed, plaintiff lived in Tucson, Arizona. Therefore, the ABCMR did not ignore or the date sequences of flagging, nor did the ABCMR fail to consider the testimony regarding plaintiff's demand to transfer to a local unit.

Plaintiff asserts that his assignment to the MIAD unit was never voluntary, but that if it was, he revoked his consent by requesting a transfer, thus, triggering immediate approval under Army Regulation 140-10. Plaintiff is incorrect in both respects. The Administrative Record indicates that plaintiff volunteered to join the MIAD unit in Phoenix, Arizona when he lived in Tucson, Arizona. If plaintiff traveled that distance voluntarily, there was no misapplication of Army Regulation 140-10 ¶ 1-10 because that regulation defines a "reasonable commuting distance" as "the longest distance a USAR soldier can be expected to travel involuntarily between his or her residence and a site where inactive duty training . . . will be conducted." Army Reg. 140-10 ¶ 1-10(a).

---

(2) Sending a written request for assignment orders by following the procedures described in paragraph 1–8a(1). (3) Contacting a recruiter at the local U.S. Army recruiting office . . . [or] (4) Accepting an assignment on release from AD (Active Army or USAR AGR [Active Guard and Reserve] status) via the Reserve Component Transition or Reenlistment noncommissioned officer (NCO) located at most active military installations."); Army Reg. 140-10 ¶ 1-8(a)(1) (2005) (providing that Department of the Army Form 4651 (Request for Reserve Component Assignment or Attachment) should be used for requesting transfer, assignment, or attachment orders in writing).

Furthermore, there is no evidence in the Administrative Record or Army Regulation 140-10 that a request to transfer to a closer geographical unit "should have been granted immediately." The ABCMR considered plaintiff's November 30, 2006 letter to Captain Orlandella requesting that he be excused from the December 15-17, 2006 battle assemblies. In this letter, although plaintiff partially quotes the relevant regulation for rescheduling training, Army Regulation 140-1, plaintiff leaves out a portion of the regulation which gives the unit commander the discretion to approve an absence and reschedule soldier training. See Army Reg. 140-1 ¶ 3-12(e)(1) (2004) ("[E]mployment conflicts, overtime, schooling, loss of income, verified medical problems or personal emergencies, may in the judgment of the unit commander, justify RST authorization."). Plaintiff's commander, Captain Orlandella, repeatedly denied plaintiff's request to be excused from training. For example, the May 31, 2007 counseling statement makes clear that no transfer request would even be considered until after plaintiff fulfilled his obligations to the unit. Additionally, the October 29, 2007 "Letter of Instruction" warning plaintiff about unexcused absences and explaining proper excused absence request procedures. There is no evidence in the Administrative Record that plaintiff provided any evidence to the ABCMR that any request by plaintiff to transfer or request to be excused from any battle assemblies was ever approved, or that the flag on his file was removed. Nor does plaintiff provide any such evidence to this court. As noted above, plaintiff never alleges that his commander approved any request for transfer. Therefore, the ABCMR's determination that plaintiff missed scheduled training events was not arbitrary or capricious, unsupported by substantial evidence, or contrary to applicable law.

Plaintiff also asserts that the Board of Inquiry unlawfully "permitted the submission of a telephone wiretap/recording to the board of separation that appears to be obtained through the commission of a felony under state laws barring the recording and transmission to third parties of telephone conversations without authorization of all parties." (footnote omitted). The ABCMR generally found that plaintiff "failed to provide evidence showing that any of the actions taken against him was the result of his desire to be reassigned to another unit that the board of officers failed to comply with applicable regulations." Defendant notes that "Mr. McClellan cites to no evidence to support this allegation and the evidence of record is completely devoid of any supportive evidence."

The summary transcript from the Board of Inquiry hearing indicates that a memorandum outlining a telephone conversation plaintiff had with an officer was submitted into evidence. The transcript references a "[t]elephone conversation with 2LT McClellan" contained in "Government Exhibit 9." Government Exhibit 9 submitted to the Board of Inquiry is a written memorandum by Major G. Lawrence Lamb III summarizing his recollection of a phone conversation he had with plaintiff. As defendant notes the exhibit is not a telephonic recording or wiretap. As there was no wiretap or commission of a felony, the ABCMR's decision that the Board of Inquiry did not commit error or injustice or violate plaintiff's rights was not arbitrary or capricious, unsupported by substantial evidence, or contrary to law.

Plaintiff further alleges that the Army "refused to produce any documentation whatsoever, elucidating either the conduct of, or the outcome of the Board of Inquiry . . . for approximately one year after the hearing." He also contends that the ABCMR's decision to uphold his discharge under "Other than Honorable" conditions is arbitrary since "the Board for Correction [ABCMR] failed to consider the substantial harm caused to plaintiffs [sic] ability to seek redress due to this delay including hindering the ability to challenge procedures, submit appeals prior to the finalization of separation, or to locate or identify and question witnesses under oath." Defendant alleges that the ABCMR did not err by finding "'no evidence of any violation of . . . [plaintiff's] rights'" and that plaintiff "'provided insufficient evidence to substantiate the contentions made within his appeal.'"

In plaintiff's case, the Board of Inquiry was appointed by the Military Intelligence Readiness Command. The Board of Inquiry commenced on December 17, 2007, and the Military Intelligence Readiness Command approved the Board of Inquiry's recommendation to discharge plaintiff on September 30, 2008. Plaintiff appears to allege that he received the documentation in December 2008, as plaintiff claims he received the documents "approximately one year after the hearing." Defendant asserts that "Mr. McClellan received the [Board of Inquiry] documents no more than 10 weeks after approval. This delivery timetable comports with the applicable Army regulation." The Administrative Record reflects that the Army authorities compiled the documentation of the Board of Inquiry decision between the date of appointing authority approval of plaintiff's Board of Inquiry decision in September 2008 and the general time when plaintiff alleges he received the Board of Inquiry decision documentation in December 2008.

The ABCMR explained the involuntary separation process and paraphrased Army Regulation 135-175, stating,

> [w]hen a board recommends the involuntary separation of an officer, Headquarters, Department of the Army (Commander, U.S. Army Human Resources Command (HRC) St. Louis) will, as appropriate, approve the recommendations of the board and advise the commander concerned to take necessary action to separate the officer. The president of the board will ensure that the respondent is granted such time as is reasonably necessary to prepare and present his case. Undue delay will not be permitted and the case will be conducted as expeditiously as possible.

Army Regulation 135-175 provides that the president of the Board of Inquiry shall "[e]nsure that the respondent is granted such time as is reasonably necessary to prepare and present his case. Undue delay will not be permitted and the case will be conducted as expeditiously as possible." Army Reg. 135-175 ¶ 2-21(a) (1987). Army Regulation 15-6, the applicable regulation governing the requirement to furnish a report of Board of Inquiry proceedings to plaintiff, provides that:

> [u]pon approval or other action on the report of proceedings by the appointing authority, the respondent or counsel will be provided a copy of the report, including all exhibits and enclosures that pertain to the respondent. Portions of the report, exhibits, and enclosures may be withheld from a respondent only as required by security classification or for other good cause determined by the appointing authority and explained to the respondent in writing.

Army Reg. 15-6 ¶ 5-10 (2006).[13]

Army Regulation 15-6 ¶ 5-10 does not contain a specific timeline for furnishing documentation to the subject of a Board of Inquiry, nor does the Army Regulation mandate, as plaintiff claims, that the documentation "be made available to respondent immediately." Plaintiff does not cite to any other Army Regulation which compels documentation be made immediately. The ABCMR noted that "cases will be conducted as expeditiously as possible." Plaintiff asserts that "approximately one year" after the Board of Inquiry commenced on December 17, 2007, plaintiff received the documentation from the Army. Although plaintiff claims his ability to "seek redress due to this delay including hindering the ability to challenge procedures, submit appeals prior to the finalization of separation, or to locate or identify and question witnesses under oath," was hampered by what he alleged was delay in receiving the documentation, he raised these allegations with the ABCMR. Furthermore, plaintiff's appeal rights were not harmed as plaintiff claims. Under Army Regulation 135-175,

> [a]n officer has the right to appeal an unfavorable action under this regulation which affects his military status . . . . An appeal will be submitted in writing by the individual concerned within 15 days of notification of adverse action. The application will state the reason for the appeal and explain the facts pertinent to his case that he feels were not fully considered, including any additional evidence he may wish to present. The appeal will be submitted for reconsideration, through channels, to the authority who originally took the final unfavorable action. If that authority does not grant the appeal, it will be forwarded as follows: (1) If the original final authority was the area commander, the appeal will be forwarded to the commander, U.S. Army Human Resources Command (HRC).

Army Reg. 135-175 ¶ 1-12(b) (1987).

As noted above, on March 6, 2009, the Commander of the United States Army Reserve forwarded plaintiff's Board of Inquiry separation results to the commander of the United States Army Human Resources Command requesting final action, and on

---

[13] Although defendant incorrectly asserts twice that "[t]he ABCMR referenced the applicable Army regulation (Army Reg. 15-6)." The ABCMR did not reference Army Regulation 15-6 in its decision.

October 9, 2009, the United States Army Human Resources Command approved the Board of Inquiry's recommendation to discharge plaintiff. Plaintiff, therefore, had fifteen days from the October 9, 2009 date to file a notice of appeal. His ability to appeal was not hampered, as plaintiff indicated that, in December 2008, he received materials from the Board, apparently one year after the Board met, and could have spent from December 2008 until October 24, 2009, to prepare for any appeal relating to his separation board proceedings. The ABCMR properly determined that Mr. McClellan "provided insufficient evidence to substantiate the contentions made within his appeal." Moreover, the ABCMR concluded that "[t]here is no evidence of any violation of the applicant's rights." In the record before the court, there is no evidence that ABCMR decision was made arbitrarily or capriciously, unsupported by substantial evidence, or contrary to law.

Plaintiff further alleges that he was "denied due process of law by the refusal of the Defendant to provide for expenses for transport to the board of separation hearing." The ABCMR determined that plaintiff did not demonstrate "that the board of officers failed to comply with applicable regulations." The ABCMR determined that plaintiff "has not shown error or injustice in the action taken by the board of officers." Therefore, the ABCMR concluded that "[t]here is no evidence of any violation of the applicant's rights." Defendant argues that "Mr. McClellan was not denied due process of law because the Army did not agree to pay his expenses to attend the board of separation hearing," because the Army Regulations permit plaintiff to bring his case at his own expense and the "ABCMR record of proceedings and the evidence of record establish that Mr. McClellan was advised of these rights at the initiation of his separation action and then again by the Judge Advocate prior to the separation board hearing."

Army Regulation 135-175 ¶ 2-17(a) states in part, "[t]he area commander convening the board of officers will notify the officer of his right to . . . (3) Present his case before a board of officers at personal expense." Army Reg. 135-175 ¶ 2-17(a). As is reflected multiple times in the record before the court, plaintiff was advised of this right to present evidence at his own expense. For example, in the August 2007 "Notification of Pending Involuntary Separation Action" addressed to plaintiff, the notification specifically refers to Army Regulation 135-175 and states that plaintiff has the right to "[b]e present at the board of officers, at your own expense, and be allowed a reasonable period of time for preparing your case." (emphasis added). Plaintiff was aware he would have to travel at his own expense as a December 2007 email to JAG attorney Giblin makes clear. Plaintiff wrote to JAG attorney Giblin, in part: "If the government cannot, or refuses to provide transportation, I have no means of attending, despite my sincere wish to attend indeed." Although plaintiff claimed before the ABCMR that his former counsel wrote a letter to Arizona State Bar that "he has never before seen a unit refuse to pay for transport of a defendant to an administrative hearing," plaintiff cites to no Army Regulation or any other source for support. As Army Regulation 135-175 ¶ 2-17(a) provides for plaintiff to present his case as his own expense, there is no evidence that ABCMR's determination that plaintiff's due process rights were not violated was made arbitrarily or capriciously, unsupported by substantial evidence, or contrary to law.

Furthermore, to the extent that plaintiff bases his due process claim on the claims arising under the Due Process clause of the Fifth Amendment to the United States Constitution this court does not possess jurisdiction to consider such claims. The only reference to the Fifth Amendment in plaintiff's submissions to this court is in the first paragraph of plaintiff's amended complaint, which states: "The jurisdiction of the court is predicated on 28 U.S.C. § 1491(a)(l) and 37 U.S.C. § 206 (a) (2) and the 5th Amendment of the United States Constitution." The United States Court of Appeals for the Federal Circuit has consistently held that this court does not possess jurisdiction to consider claims arising under the Due Process clauses of the Fifth and Fourteenth Amendments. See Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (citing LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995)) (finding no jurisdiction over a due process violation under the Fifth and Fourteenth Amendments); see also Smith v. United States, 709 F.3d 1114, 1116 (Fed. Cir.) ("The law is well settled that the Due Process clauses of both the Fifth and Fourteenth Amendments do not mandate the payment of money and thus do not provide a cause of action under the Tucker Act." (citing LeBlanc v. United States, 50 F.3d at 1028), cert. denied, 134 S. Ct. 259 (2013); In re United States, 463 F.3d 1328, 1335 n.5 (Fed. Cir.) ("[B]ecause the Due Process Clause is not money-mandating, it may not provide the basis for jurisdiction under the Tucker Act."), reh'g and reh'g en banc denied (Fed. Cir. 2006), cert. denied sub nom. Scholl v. United States, 552 U.S. 940 (2007); Acadia Tech., Inc. & Global Win Tech., Ltd. v. United States, 458 F.3d 1327, 1334 (Fed. Cir. 2006); Collins v. United States, 67 F.3d 284, 288 (Fed. Cir.) ("[T]he due process clause does not obligate the government to pay money damages."), reh'g denied (Fed. Cir. 1995); Mullenberg v. United States, 857 F.2d 770, 773 (Fed. Cir. 1988) (finding that the Due Process clauses "do not trigger Tucker Act jurisdiction in the courts"); Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir. 1987) (noting that the Fifth Amendment Due Process clause does not include language mandating the payment of money damages); Harper v. United States, 104 Fed. Cl. 287, 291 n.5 (2012); Hampel v. United States, 97 Fed. Cl. 235, 238, aff'd, 429 F. App'x 995 (Fed. Cir. 2011), cert. denied, 132 S. Ct. 1105 (2012); McCullough v. United States, 76 Fed. Cl. 1, 4 (2006) ("[N]either the Fifth Amendment Due Process Clause . . . nor the Privileges and Immunities Clause provides a basis for jurisdiction in this court because the Fifth Amendment is not a source that mandates the payment of money to plaintiff."), appeal dismissed, 236 F. App'x 615 (Fed. Cir.), reh'g denied (Fed. Cir.), cert. denied, 552 U.S. 552 (2007). Due process claims "must be heard in District Court." Kam–Almaz v. United States, 96 Fed. Cl. 84, 89 (2011) (citing Acadia Tech., Inc. & Global Win Tech., Ltd. v. United States, 458 F.3d at 1334), aff'd, 682 F.3d 1364 (Fed. Cir. 2012); see also Hampel v. United States, 97 Fed. Cl. at 238. To the extent plaintiff relies on the Fifth Amendment for his due process claims, this court lacks jurisdiction.

Plaintiff also claims that the ABCMR erroneously upheld his discharge because the ABCMR "failed to consider clear evidence that Article 138 complaint was ignored in violation of the Uniform Code of Military Justice," and that the ABCMR misapplied various alleged military customs and regulations when it upheld plaintiff's discharge on "disrespect" grounds. Plaintiff alleges that the ABCMR "failed to consider complex questions and precedent" regarding whether military regulations can be applied "'at all

times' to all inactive reservists" and did not consider "allowable definitions of duty for Military Reservists." Plaintiff also alleges that the Army asserted that military regulations applied to inactive reservists "as a justification for convening the separation action." Plaintiff claims

> the DOD has historically held the view that inactive reservists and guard personnel are in fact "civilians first"; because of this historical view of the DOD itself, it seems the board totally failed to consider an important aspect of the problem and failed to address the objection of the plaintiff regarding jurisdictional questions and defining "misconduct" as simply stating facts and opinions in this regard to commanders (while inactive), and later responding to commanders with the view the commanders were exceeding authority.

Regarding plaintiff's argument that the Board of Inquiry "failed to consider clear evidence that an Article 138 complaint was ignored in violation of the Uniform Code of Military Justice," plaintiff argues that he sent "a formal Article 138 request for redress to then Captain Sandra Orlandella, LTC Joseph F. Nadolski, and then to [JAG attorney] LTC Joseph Giblin. In violation of the UCMJ the command refused to process and respond to this Article 138 complaint submission." Despite plaintiff's claims, nothing in the Administrative Record demonstrates that plaintiff filed a proper UCMJ Article 138 complaint. Defendant correctly asserts that the only evidence plaintiff provided to the ABCMR on this issue was a January 30, 2008 e-mail which does not constitute a formal UCMJ Article 138 complaint. Therefore, the ABCMR did not fail to consider evidence of plaintiff's alleged UCMJ Article 138 complaint, nor did the ABCMR uphold plaintiff's discharge arbitrarily or capriciously, or without substantial evidence in the record.

Regarding plaintiff's charge that the ABCMR misapplied various military customs and regulations when it discharged plaintiff, the ABCMR found:

> The evidence of record shows that the emails he [plaintiff] sent to his company commander commencing on 28 November 2006 were disrespectful and as a result he was issued an [sic] LOR . . . . [After] orders were published reassigning him [plaintiff] to the . . . IRR on 28 February 2007, he was notified in March 2007 that his request was denied and that he was still a member of the MIAD [Military Intelligence Augmentation Detachment] and expected to attend training. The records show he continued to show disrespect to members in his chain of command. . . . There is no evidence of any violation of the applicant's rights. He was an officer in the USAR [United States Army Reserve] and was subject to laws and regulations pertaining to USAR officers. He had an obligation to conduct himself as a USAR officer.

The ABCMR cited Army Regulation 135-175, which prescribes the policies and procedures governing the separation of Army Reserve officers. The ABCMR found:

This regulation [Army Regulation 135-175] states no person has an inherent right to continue service as an officer. The privilege of service is his only as long as he performs satisfactorily. Responsibility for leadership and example require effective performance of assigned duties and exemplary conduct at all times. The Army has no place for officers who cannot meet these requirements, and their involuntary separation is essential. In view of the rapidity with which hostilities can now occur and the attendant likelihood that an officer may be called to active duty on short notice, the same standards of efficiency and conduct apply to officers of all Reserve components.

The Administrative Record before the court supports the ABCMR's conclusions regarding plaintiff's written disrespect to his superior officers. Army Regulation 135-175 provides for administrative jurisdiction over plaintiff when he was an inactive United States Army Reserve officer. See Army Reg. 135-175 (1987) ("This regulation applies to all officers of the Army National Guard of the United States and the U.S. Army Reserve, except for officers serving on active duty or on active duty for training for a period in excess of 90 days."). Plaintiff's assertion that the Army "framed" his conduct as "disrespect" for "simply stating facts and opinions" and telling commanders they "exceed[ed] [their] authority" is not supported in the Administrative Record. The ABCMR referenced multiple e-mails from plaintiff to his superior and fellow officers evidencing plaintiff's disrespectful and threatening statements including his November 29, 2006 e-mail to Captain Orlandella, which contained the line, "I really appreciate the added stress your [sic] giving me, without cause in the final weeks of this semester. I'll make sure to repay in kind." The ABCMR also referenced plaintiff's March 8, 2007 e-mail to Lieutenant Colonel Nadolski, telling him that he "can mind [his] own business on how I choose to address anyone."

The Administrative Record also reflects the disrespect plaintiff demonstrated to his superior officers. Lieutenant Colonel Joseph Francis Nadolski, plaintiff's Battalion Commander, December 19, 2006, "Letter of Reprimand" sent to plaintiff regarding the e-mail correspondence between plaintiff and Captain Orlandella explained that Lieutenant Colonel Nadolski found plaintiff's e-mails "very disrespectful," "disturbing," and "threatening." Accordingly, Lieutenant Colonel Nadolski informed plaintiff that he was transferring him to "the Individual Ready Reserve to be noted as an unfavorable action." Lieutenant Colonel Nadolski further warned plaintiff that if Lieutenant Colonel Nadolski was "made aware of any information concerning this type of behavior between now and your transfer into the IRR, I will take swift action, possibly resulting in your punishment . . . and/or your involuntary separation from the United States Army Reserves."

Subsequently, on March 8, 2007, Lieutenant Colonel Nadolski sent plaintiff a counseling statement informing plaintiff that he remained a member of the Military Intelligence Augmentation Detachment because his transfer to the Individual Ready Reserve had not been approved. Lieutenant Colonel Nadolski further informed plaintiff of annual training that would take place on April 21-22, 2007. That same day, March 8, 2007, plaintiff e-mailed Lieutenant Colonel Nadolski, in which, although plaintiff initially

expressed remorse, he again made disrespectful statements. Plaintiff's email stated, in part, "I regret the nature of the situation that has occured [sic] between myself and the command, but stand by my actions that occured [sic] subsequent to my initial mistake of sending an email in response to an email from CPT. Orlandella that I considered disrespectful to myself." Plaintiff also stated that he "received a letter at my HOME . . . accusing me of a serious crime that the command was fully aware was a false accusation . . . . I made several requests to various members of the command after initial possible misunderstands [sic] by email for a direct meeting, only to be ignored." (capitalization in original). Regarding the counseling statement, plaintiff indicated "while I am in citizen status, as I am now, you can mind your own business on how I choose to address anyone. If you don't like it, you can write your congressman and request the law be changed." Plaintiff continued and instructed a superior officer, Lieutenant Colonel Nadolski: "You have no authority to request any American citizen be subject to military custom, courtesy and law." Therefore, plaintiff informed Lieutenant Colonel Nadolski, "I will not be signing anything or attending anything until after [sic] further consultation with legal representation . . . . Upon further consultation with legal representation, I will contact you directly. I request all further communication from the unit or affiliated personnel cease." Plaintiff's Officer Evaluation Report from August 3, 2006 to August 2, 2007, also noted that plaintiff was "disrespectful on several emails to his chain of command and failed to comply with numerous direct orders." Given this long pattern of disrespectful statements, the ABCMR correctly determined that plaintiff engaged in misconduct.

In addition to the claims addressed, and rejected, on the merits above, defendant contends that plaintiff also makes several allegations he did not raise before the ABCMR. These claims include: Count 4 of the complaint, plaintiff's claim that the ABCMR failed to comply with regulations permitting transfer "To Rehabilitate Where A Problem Exists," count 8 of the complaint, violation of due process by ineffective counsel, count 10 of the complaint, plaintiff's claim of a conflict of interest within the Board of Inquiry, and count 11 of the complaint, plaintiff's allegation that Board of Inquiry failed to provide plaintiff with an ethnic minority representative. Defendant is correct that plaintiff did not assert the allegations in counts 4, 8, 10, and 11 before the ABCMR. When a plaintiff fails to raise arguments before the ABCMR, he or she is precluded from raising those arguments for the first time before this court. See Walls v. United States, 582 F.3d 1358, 1367 (Fed. Cir. 2009) (holding that judicial review of decisions of military correction boards is review of the Administrative Record conducted under the Administrative Procedure Act); Metz v. United States, 466 F.3d 991, 999 (Fed. Cir. 2006) (holding that plaintiff waived his argument of ineffective counsel in front of the United States Court of Federal Claims because he failed to raise the issue in the first instance with the Air Force Board for the Correction of Military Records); Murakami v. United States, 398 F.3d 1342, 1354 (Fed. Cir. 2005) (holding that the Court of Federal Claims correctly concluded that plaintiff waived his argument concerning his father's constructive travel restriction by not first raising the argument with the administrative agency); Spellissy v. United States, 103 Fed. Cl. 274, 283 (2012) ("When a service member chooses first to petition a military correction board, the Court of Federal Claims' review is limited to the administrative record.") (citations omitted);

Neutze v. United States, 88 Fed. Cl. 763, 774-75 (2009) (citing Sanders v. United States, 219 Ct. Cl. 285, 594 F.2d 804, 811 (1979) ("In evaluating a Board decision, the court may not consider new arguments not raised before the Board."); see also Barnick v. United States, 80 Fed. Cl. 545, 560 (2008) ("[t]he court will not consider materials that were not presented to a review board"), aff'd, 591 F.3d 1372, 1374 (Fed. Cir. 2010) (internal citations omitted).

Therefore, Mr. McClellan is precluded from bringing those claims, which were not raised in the first instance at the administrative level, to this court because "[s]imple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." Metz v. United States, 466 F.3d at 999 (quoting United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952)). This rule "ensures that agencies will have the opportunity to develop their positions and correct their errors before an appeal." Village of Barrington, Ill. v. Surface Transp. Bd., 636 F.3d 650, 655 (Fed. Cir. 2011) (citing United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. at 37). Because plaintiff did not assert in the first instance to the ABCMR his allegations that his discharge was not lawfully based because the ABCMR failed to comply with regulations permitting transfer, the Board of Inquiry had a conflict of interest, the Board of Inquiry lacked ethnically representative members, or that plaintiff's due process was violated by ineffective counsel, plaintiff has waived these claims and this court does not have jurisdiction to review them.

As noted above, in plaintiff's Response and Cross-Motion for Judgment on the Administrative Record plaintiff requests that if this court "finds a claim has not been stated for which relief can be granted by the Court or if this honorable Court finds no subject-matter jurisdiction plaintiff respectfully requests the case be transferred to the Federal District Court for the District of Columbia." As noted by defendant, "Mr. McClellan fails to assert any grounds, or offer any explanation for, the transfer of his claims to the United States District Court for the District of Columbia." Although defendant is correct that plaintiff failed to offer any arguments or explanation for why his claims should be transferred to District Court, as plaintiff is proceeding pro se, the court addresses the validity of a transfer to Federal District Court. Pursuant to 28 U.S.C. § 1631:

> Whenever a civil action is filed in a court as defined in section 610 of this title[14] or an appeal, including a petition for review of administrative action,

---

[14] Section 610 of Title 28 states:

> As used in this chapter the word "courts" includes the courts of appeals and district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, the District Court of the Virgin Islands, the United States Court of Federal Claims, and the Court of International Trade.

is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

28 U.S.C. § 1631; see also Texas Peanut Farmers v. United States, 409 F.3d 1370, 1374 (Fed. Cir. 2005). Therefore, "[t]ransfer is appropriate when three elements are met: (1) The transferring court lacks subject matter jurisdiction; (2) the case could have been filed in the court receiving the transfer; and (3) the transfer is in the interests of justice." Brown v. United States, 74 Fed. Cl. 546, 550 (2006) (citing 28 U.S.C. § 1631; see also Pleasant-Bey v. United States, 99 Fed. Cl. 363, 368 (2011), appeal dismissed, 464 F. App'x 879 (Fed. Cir. 2012).

As noted by defendant, and as addressed above, the court has jurisdiction over, and reviewed the merits of, counts 1, 2, 3, 5, 6, 7, 9, and 12. The defendant confirmed to this court that "[t]he Government acknowledges that the Court possesses jurisdiction to entertain Mr. McClellan's claims under 28 U.S.C. § 1491(a)(1), in conjunction with 37 U.S.C. § 206(a)(2). "Therefore, transfer is inappropriate over those claims. For plaintiff's remaining counts, counts 4, 8, 10, and 11, transfer is inappropriate because this court determined plaintiff was precluded from bringing those claims which were not raised in the first instance at the administrative level to this court. See Metz v. United States, 466 F.3d at 999. Plaintiff would face the same obstacle in the United States District Court for the District of Columbia, and, therefore, transfer would be futile and not in the interest of justice. See Potter v. United States, 108 Fed. Cl. 544, 548 (2013).

Alternatively plaintiff requests "[r]emand of case to the Army Board for Correction of Military Records (ABCMR)." Defendant argues that "Mr. McClellan fails to explain or offer any basis for his request for a remand of his claims to the ABCMR, which fully addressed and resolved his claims. Mr. McClellan's 'alternative' requests for remand and transfer should accordingly be rejected." The court agrees with defendant. The court has ruled against plaintiff on counts 1, 2, 3, 5, 6, 7, 9, and 12. For the remaining four counts, counts 4, 8, 10, and 11, plaintiff failed to raise those claims before the ABCMR in the first instance. Plaintiff has provided no reason why plaintiff should be entitled to bring the claims before the ABCMR on remand. Plaintiff's request for remand is denied. Therefore, the court declines, either to transfer the case to the United States District Court for the District of Columbia or to remand the case to the ABCMR.

---

28 U.S.C. § 610 (2012); see also Acceptance Ins. Cos. Inc. v. United States, 503 F.3d 1328, 1332 n.4 (Fed. Cir. 2007).

## CONCLUSION

Defendant's Motion for Judgment on the Administrative Record is **GRANTED**. Plaintiff's Cross-Motion for Judgment on the Administrative Record is **DENIED**. Plaintiff's requests to transfer his case to the United States Court for the District of Columbia or to remand his case to the Army Board for Correction of Military Records are **DENIED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion dismissing plaintiff's complaint.

IT IS SO ORDERED.

**MARIAN BLANK HORN**
Judge